Bradley J. Dixon (ISB No. 6167)
Kersti H. Kennedy (ISB No. 9064)
Givens Pursley LLP
601 West Bannock Street
PO Box 2720
Boise, ID  83702
Phone:  (208) 388-1200
Fax:  (208) 388-1300
bradleydixon@givenspursley.com
kerstikennedy@givenspursley.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THE ROOST PROJECT, LLC, a California limited liability company,<br><br>           Plaintiff,<br><br>   vs.<br><br>ANDERSEN CONSTRUCTION COMPANY, an Oregon corporation,<br><br>         Defendant. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff The Roost Project, LLC, by and through its counsel of record Givens Pursley

LLP, for the causes of action against Defendant Andersen Construction Company pleads, alleges

and complains as follows:

## PARTIES

1.      The Roost Project, LLC ("Roost") is a California limited liability company

authorized to do business in the state of Idaho.  It is the developer of a mixed-use building,

predominantly developed as a residential apartment building, called "The Fowler" located at

401 S. 5th Street, Boise, Idaho 83702.  This building will be referred to herein as "The Fowler."

**COMPLAINT AND DEMAND FOR JURY TRIAL - 1**
14178398_6

2.      Andersen Construction Company ("ACCO") performs construction services in the state of Idaho and was the general contractor for The Fowler.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction of all causes of action asserted herein pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00. Jurisdiction is further proper under the parties' agreement.

4.      Venue is proper under 28 U.S.C. § 1391, because the acts and omissions giving rise to Roost's claim occurred in the District of Idaho, and the real property involved is located in Ada County, Idaho. Venue is further proper under the parties' agreement.

## GENERAL ALLEGATIONS

5.      This lawsuit concerns ACCO's delivery of The Fowler eight months beyond the agreed upon substantial completion date.

6.      ACCO blames an eight month construction delay on a single weather event that occurred in December of 2016 and January of 2017.

7.      As fully identified within the following allegations, the delay was actually a result of ACCO's failure to seal the building on time and in advance of the weather event, negligent snow removal techniques, project mismanagement, organizational failures with regard to scheduling and subcontractor management and a failure to properly perform under the agreement of the parties.

8.      ACCO exacerbated its mismanagement of the project by making material misrepresentations to Roost to prevent Roost from exercising its rights under the agreement between the parties and by failing to cooperate with Roost regarding insurance coverage and other logistical matters needed to coordinate for the turnover of the project.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 2**
14178398_6

9.      On December 12, 2015, Roost and ACCO entered into a Construction Agreement.

10.     A true and correct copy of the Construction Agreement is attached to this Complaint as **EXHIBIT 1**.

11.     The Construction Agreement (32 Pages) additionally includes six separate attached exhibits as follows:

  i.   Exhibit A – Plans and Specifications

  ii.  Exhibit B – Project Schedule

  iii. Exhibit C – Contractor's Fee, Guaranteed Maximum Price, Schedule of Values

  iv.  Exhibit D – Cost of the Work

  v.   Exhibit E – Insurance Requirements

  vi.  Exhibit F – Forms

12.     Article 8 (Commencement and Completion of Work of Contractor) of the Construction Agreement sets forth detailed requirements binding ACCO to certain schedules, reporting requirements and deadlines with respect to the performance of its general contractor duties for the Project.

13.     Article 8.1 (Project Schedule) states as follows:

> **8.1     Project Schedule**
>
> Contractor will commence performance of the Work upon Owner's notice to proceed and will diligently and expeditiously continue its performance until all Work has been fully completed. The dates in the Project Schedule are of the essence and will not be exceeded by Contractor without Owner's prior consent or as permitted in Section 8.3.2. If and when Contractor has reason to believe that any date in the Project Schedule may not be met, Contractor will make appropriate recommendations to Owner to keep the Work on schedule, bring the Work back on schedule and/or mitigate potential impacts of a delayed performance. Contractor represents and warrants to Owner that the Substantial Completion Deadline provides a reasonable time for completing the entire Work, including the time specified for the review of Contractor Submittals by Owner and Governmental Authorities.

14.     Article 8.2 (Contractor's Construction Schedule) states as follows:

**8.2     Contractor's Construction Schedule**

On or before the deadline in the Project Schedule, Contractor will prepare for Owner's information a comprehensive construction schedule that specifies the proposed starting and finishing dates for each task required for the construction of the Work (including each task of Owner, Contractor and each major trade) and Owner's loading as identified in Section 8.4. The Construction Schedule is to provide reasonable time periods for the reviews and actions of Owner, each Governmental Authority and others required for the proper performance of the Work.

15.     Article 8.3 (Delays and Extensions of Time) states as follows:

**8.3     Delays and Extensions of Time**

8.3.1     Contractor will use due foresight and diligence to avoid or overcome any matters that might wholly or partially prevent or delay Contractor's timely performance of the Work. Contractor will immediately notify Owner if any matter wholly or partially prevents or delays Contractor's timely performance of the Work (regardless of who might bear fault for the matters). Contractor will continue to provide Owner regular reports with respect thereto and will forecast the duration of any prevented or delayed performance. Contractor will exercise all reasonable efforts to mitigate or limit the impacts of the matters on Contractor's performance of the Work. Contractor will continue to timely perform any obligations not prevented by the Force Majeure. Contractor agrees to resume performance of any prevented or delayed Work as soon as the matter preventing or delaying the performance no longer does so.

8.3.2     If the critical path of Contractor's performance is wholly or partially prevented or delayed due to (a) any failure of Owner to fulfill its obligations to Contractor under the Contract Documents, (b) any interference with Contractor's performance by the action or inaction of Owner or its employees, agents or separate contractors, (c) the occurrence of a Force Majeure or (d) any other matter in which Contractor believes Owner bears responsibility under the Contract Documents, Contractor may make a Claim for an Equitable Adjustment to the Project Schedule for any impacts on Contractor's performance that Contractor could not reasonably have been expected to avoid, overcome or mitigate through the exercise of due foresight and reasonable due diligence; provided, however, as a condition precedent to making any Claim for an Equitable Adjustment, Contractor will specifically notify Owner of (a) the specific events or occurrences that Contractor claims to be causing the prevention or delay of Contractor's performance, (b) if known to Contractor, the party or parties that Contractor believes to be responsible for the events or occurrences, and (c) if known to Contractor, what actions Owner can take to avoid, overcome or mitigate the effects of the events or occurrences. Contractor is not entitled to any Equitable Adjustment for any impacts on Contractor's performance without prompt delivery of the foregoing notice to Owner (in this instance "prompt delivery" shall mean 24 hours or less). Owner will promptly respond to Contractor's notice. Upon receipt of an impact notice hereunder from Contractor, Owner will promptly use commercially reasonable efforts to cure impacts that are Owner's responsibility, will keep Contractor reasonably informed of Owner's efforts and will coordinate the efforts with Contractor. Contractor acknowledges and agrees that its sole remedy against Owner for any prevention or delay of Contractor's performance from any cause whatsoever is an Equitable Adjustment to the Project Schedule.

16.     ACCO broke ground on the Project in February 2016.

17.     Consistent with Exhibit B to the Construction Agreement, the Project was set for substantial completion on May 30, 2017.

18.     The building shell, pursuant to Exhibit B to the Construction Agreement, was required to be completed by December 9, 2016.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 4**
14178398_6

19.     Sections 8.1 and 8.2 of the Construction Agreement mandate detailed project schedules, specifically identify that time is of the essence for the project and impose specific reporting obligations.

20.     Similarly, Section 8.3 of the Construction Agreement imposes specific reporting requirements if any deviation from the substantial completion or critical pathways occurs.

21.     Although ACCO was hired based largely on their reputation as a large contractor with sophisticated scheduling tools, ACCO was immediately behind schedule.

22.     ACCO was involved with The Fowler beginning with the conceptual design phase and phase thereafter.  Despite ACCO's intimate involvement with the project, it was eventually determined that the original project schedule was filled with error and lacked necessary scheduling logic.

23.     The original schedule had to be completely re-configured by a replacement lead superintendent and the ACCO superintendent that created the original schedule was removed from the project.

24.     Between July and September of 2016 ACCO created an entirely new and different master schedule to correct the errors and omissions from the original schedule.  Nonetheless, ACCO did not report delay as a result of that schedule change.

25.     Throughout the course of the performance of the Construction Agreement in the fall of 2016, ACCO was reporting no more than a 22 day deviation from substantial completion despite its scheduling errors.  Nonetheless, an evaluation of the project in early fall of 2016 revealed some very concerning issues with The Fowler.

26.      On September 23, 2016, Patrick Boel, on behalf of Roost, wrote to ACCO expressing his significant concerns about the schedule stating "Fowler is a month or two behind

and it doesn't appear to be getting better."  A true and correct copy of that e-mail is attached hereto as **EXHIBIT 2.**

27.    In sum, ACCO was not on schedule with regard to completing The Fowler roof and sealing project, yet continued to represent in written schedules that the project was on schedule.

28.    ACCO continued to represent a timely substantial completion even in the face of Roost's written analyses of scheduling concerns.

29.    Roost, pursuant to the Construction Agreement was not obligated to track scheduling or substantial completion was entitled to rely upon the representations and reporting of ACCO.

30.    Severe weather occurred in Boise, Idaho in mid-December of 2016.

31.    The Fowler was behind schedule and the building was not sealed.

32.    A significant amount of snow and moisture entered The Fowler.  The Fowler is a wood framed structure.  Nonetheless, ACCO opted to melt the snow rather than remove the snow—an action that caused damage to the structure.

33.    Despite the weather event, ACCO continued to report less than one month's worth of delay.  The substantial completion reports, specifically represented by ACCO, are as follows:

> i.  On February 16, 2016 ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 5, 2017, six days late.
>
> On March 28, 2016 ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 2, 2017, three days late.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 6**
14178398_6

ii.   On April 28, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 9, 2017, 10 days late.

iii.  On May 9, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 14, 2017, 15 days late.

iv.   On May 16, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 26, 2017, 27 days late.

v.    On May 23, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 26, 2017, 27 days late.

vi.   On May 31, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

vii.  On June 7, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

viii. On June 13, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

ix.   On June 20, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

x.    On June 27, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

xi.   On July 20, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

xii.  On September 2, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 13, 2017, 14 days late.

xiii.   On September 30, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 13, 2017, 14 days late.

xiv.   On November 7, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xv.   On December 1, 2016, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xvi.   On December 7, 2016, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xvii.   On December 14, 2016, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.[1]

xviii.   On January 5, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xix.   On January 11, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xx.   On January 19, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xxi.   On February 2, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xxii.   On February 16, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xxiii.   On March 2, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

---

[1] The building shell was not completed on schedule or within the approved delay periods.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 8**
14178398_6

xxiv. On March 9, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xxv. On March 15, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xxvi. On April 6, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

34.     Pursuant to Article 8 of the Construction Agreement, Roost approved the 22 day delay that had consistently been reported by ACCO since November 7, 2016.

35.     On May 6, 2017, ACCO sent a schedule update to Roost.  That schedule update identified, for the first time, a January 26, 2018 substantial completion date.  The schedule update identified an incredible additional delay of 219 days for a total of 241 days behind the contractually agreed upon substantial completion. Roost in no way approved this delay.

36.     On May 12, 2017, Mike Brown, on behalf of Roost, sent correspondence to ACCO advising of the Roost position on the revised schedule.  A true and correct copy of that letter is attached hereto as **EXHIBIT 3.**

37.     Also on May 12, 2017, ACCO sent correspondence to Roost, detailing its position on the reasoning for the 241 day delay.  A true and correct copy of that correspondence is attached hereto as **EXHIBIT 4.**

38.     The May 12, 2017, ACCO letter essentially argues that a snowstorm in late December of 2016 and early January of 2017 coupled with a shortage of construction labor formed the basis for the unapproved delay.

39.     On May 17, 2017, Roost sent a responding letter detailing its position on the ACCO May 12 letter.  A true and correct copy of this correspondence is attached hereto as

**EXHIIBIT 5.** This correspondence suggests a mechanism for appropriate reporting, supplementation of the construction project and the potential need for the termination of ACCO and hiring of a new general contractor.

40.     On May 19, 2017, ACCO sent correspondence again suggesting that a snowstorm was the basis for the extensive delays and denying its obligations to properly report under the Construction Agreement.  However, ACCO also stated that it had developed a plan to reach substantial completion by November 1, 2017.  A true and correct copy of this correspondence is attached hereto as **EXHIBIT 6.**

41.     On May 23, 2017, counsel for Roost sent ACCO a notice to cure letter pursuant to Section 16.1.1 of the Construction Agreement, outlining Roost's position on the alleged delay, detailing ACCO's failure to submit appropriate information, failure to submit proper schedule updates and failure to properly staff the project.  Roost further triggered its rights under the Construction Agreement to terminate ACCO as the general contractor.  A true and correct copy of the correspondence is attached hereto as **EXHIBIT 7.**

42.     On May 30, 2017, counsel for ACCO sent a letter purporting to be a claim for extension of time and response to the notice to cure pursuant to the Construction Agreement.  A true and correct copy of that correspondence is attached here as **EXHIBIT 8.**  That letter continues to place blame on the weather and labor availability for a seven-month delay.  But, the correspondence commits to a November 6, 2017 substantial completion.  No updated schedule with the details regarding the proposed November 6 deadline was provided.

43.     On June 2, 2017, counsel for Roost responded to the May 30, 2017, correspondence.  That correspondence details the continued need for updated reporting,

schedules and responds to factual inaccuracies alleged in the May 30 correspondence.  A true

and correct copy of that correspondence is attached hereto as **EXHIBIT 9.**

44.     Also on June 2, 2017, Roost sent correspondence directly to ACCO stating

> We are completely in the dark here about when and if we will be able to
> occupy our multi-million dollar project.  We received Martin's one
> sentence email yesterday stating that a schedule will be delivered next
> week showing a November 6th completion date, but we have no way of
> knowing why you are taking so long to deliver it.

A true and correct copy of that correspondence is attached hereto as **EXHIBIT 10.**

45.     On June 3, 2017, counsel for ACCO sent additional correspondence continuing to

fail to properly document the delay and failing to provide an updated schedule but demanding

the initiation of the dispute resolution process pursuant to Section 17 of the Construction

Agreement.  A true and correct copy of the correspondence is attached hereto as **EXHIBIT 11.**

46.     On June 5, 2017 counsel for Roost responded to the ACCO letter.  A true and

correct copy of that correspondence is attached hereto as **EXHIBIT 12.**  Specifically, the June 5

letter details section 17.1.2 of the Construction Agreement which states:

> 17.1.2   *Contractor will support any Claim by documentation that is reasonably sufficient for
> Owner to determine its accuracy and appropriateness.* The additional documentation must include, to the extent
> known or through the exercise of reasonable diligence should be known at the time, at a minimum (a) a narrative of
> the specific acts, events, facts and circumstances giving rise to the Claim, (b) a detailed accounting of the amount of
> additional compensation, if any, requested by Contractor; (c) a detailed accounting of the amount of additional time,
> if any, requested by Contractor; (d) an analysis confirming that the Contract Documents entitles Contractor to the
> additional compensation or additional time requested; and (e) an analysis confirming that the Claim is not covered
> by insurance required of Contractor under the Contract Documents (whether or not Contractor actually maintained
> the insurance). Failure to provide the additional information and documentation, to the extent the information and
> documentation was reasonably available to Contractor, within the time allowed or within the format required will, to
> the extent Owner's interests are prejudiced, constitute a waiver of Contractor's Claim.

Thus, while demanding the initiation of the dispute resolution process, ACCO was withholding

details regarding the substance of its alleged delay and was refusing to provide a full and updated

schedule consistent with the Construction Agreement.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 11**
14178398_6

47.     Not until late in the day on June 7, 2017, did Roost receive The Fowler Master Schedule 6-6-17 (the "Updated Schedule").  A true and correct copy of that schedule is attached hereto as **EXHIBIT 13.**

48.     The Updated Schedule includes a multitude of alleged completion deadlines by ACCO including a November 6, 2017 substantial completion deadline.

49.     Roost relied on the representations contained within the Updated Schedule.

50.     On June 12, 2017, counsel for Roost sent correspondence detailing the Updated Schedule.  Therein, Roost further agreed to a July 11, 2017 mediation.  A true and correct copy of that correspondence is attached hereto as **EXHIBIT 14**.

51.     On June 13, 2017, Roost sent correspondence to ACCO detailing its concerns with the Updated Schedule.  These concerns included a variety of issues that were not properly evaluated in the Updated Schedule.  A true and correct copy of the correspondence is attached hereto as **EXHIBIT 15.**

52.     On June 23, 2017 counsel for ACCO left a voice message with counsel for Roost stating that ACCO preferred to delay the mediation.

53.     In early August, 2017 ACCO submitted a master schedule that was largely consistent with the Updated Schedule suggesting a substantial completion date of November 8, 2017.

54.     By August 3, 2017 it had become clear to Roost that ACCO had begun falling behind on critical pathway tasks on its Updated Schedule and would not reach the November 6, 2017 substantial completion deadline nor the November 8, 2017 deadline.

55.     On August 4, 2017, Roost sent correspondence to ACCO detailing its concerns with ACCO's progress toward the substantial completion deadline.  A true and correct copy of

that correspondence is attached hereto as **EXHIBIT 16.**  That letter details the failure to provide sufficient labor to the project and requests reasonable assurances regarding the substantial completion deadline in the form of further schedule logic analysis, milestone tracking, and a description of efforts ACCO was taking to catch up certain critical pathway elements.  Finally that letter details the requirement that insurance would have to be renewed at a substantial cost if ACCO failed to achieve the represented deadlines.

56.     Having received no reasonable assurances as requested in the August 4, 2017, letter, Roost sent a letter to ACCO on August 21, 2017, regarding the need for assurances on the substantial completion deadline.  A true and correct copy of that letter is attached hereto as **EXHIBIT 17.**  Therein, Roost details its need for additional information and need to rely upon the represented substantial completion deadline.  Specifically, Roost advises ACCO that it must commence with marketing activities, hiring a building manager, hiring leasing agents, identifying a training schedule, preleasing and leasing all based on the represented substantial completion deadline.  Roost expressed that the additional information was required by August 25, 2017.

57.     On August 22, 2017, ACCO sent correspondence providing no additional information and promised an updated schedule "in the next few days."  A true and correct copy of that letter is attached hereto as **EXHIBIT 18.**

58.     On September 26, during a meeting between ACCO and Roost, ACCO acknowledged for the first time that it would not obtain the November 8, 2017, substantial completion and that substantial completion would not occur until December of 2017.  Roost again requested a written schedule update and documentation consistent with the Construction Agreement.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 13**

59.     On October 2, 2017, ACCO sent e-mail correspondence to Roost with a rudimentary schedule update providing no analysis or explanation but acknowledging for the first time in writing that it would not come close to substantial completion by November 8, 2017. A true and correct copy of that e-mail is attached hereto as **EXHIBIT 19.**

60.     On October 3, 2017, Roost received a claims determination on a claim on the Travelers Insurance Company's "Builder's Risk Policy" that insures Roost and ACCO.  A claim on the policy was made in the amount of approximately $4.5 million.  The insurer approved only $1.346 million of that claim.  The claims decision is based upon a September 26, 2017, analysis from HSNO, a forensic accounting firm, and a September 25, 2017, analysis from JS Held.  True and correct copies of those reports are attached hereto as **EXHIBITS 20 and 21.**

61.     Both the HSNO and JS Held reports criticize the recordkeeping of ACCO and declined to entertain the notion that a single weather event caused the delay alleged by ACCO.

62.     Given the substantial failure on the part ACCO to properly document the project, update schedules and log work, Roost hired Adjusters International to assist as an independent adjuster to maximize the recovery from the insurance carrier.

63.     On October 16, 2017, Roost requested an updated schedule.

64.     By October 19, 2017, ACCO had completely abandoned any notion of schedule updates or documentation of the critical pathways for the project.  In response to yet another excuse about subcontractor availability, Roost e-mailed ACCO expressing frustration with the absence of schedule updates and advising that Roost's lender was demanding a revised schedule. Roost further requested an immediate phone call to discuss.  A true and correct copy of that e-mail is attached hereto as **EXHIBIT 22.**

65.     On October 19, 2017, a telephone call occurred between Roost and ACCO. Therein, ACCO acknowledged that it did not have necessary data to issue an updated schedule, indicated that it did not want to issue a schedule that would simply keep changing and stated that they were struggling with subcontractor availability.

66.     On October 20, 2017, ACCO e-mailed a rudimentary schedule identifying a substantial completion of December 21, 2017.  A true and correct copy of that schedule is attached hereto as **EXHIBIT 23.**

67.     On October 25, 2017, Roost sent correspondence to ACCO in response to the updated schedule and addressed concerns regarding subcontractor availability.  A true and correct copy of that letter is attached hereto as **EXHIBIT 24.**  That letter details a demand for supplementation and even provides names and contact information for subcontractors that Roost was able to identify as available to supplement construction.

68.     On October 25, 2017, counsel for Roost also sent correspondence to counsel for ACCO regarding the status of the construction.  A true and correct copy of the letter is attached hereto as **EXHIBIT 25.**  The letter is yet another notice to cure demanding proper documentation of the schedule, proper reporting of critical path goals and supplementation of the project with additional labor.

69.     On November 3, 2017, an updated master schedule was provided that omitted a substantial completion deadline but had project task items scheduled in to 2018.  This schedule established a substantial deviation from the Updated Schedule that Roost relied upon.

70.     On November 15, 2017, Roost responded to the November 3, 2017, schedule detailing a number of comments, concerns and areas where additional information was still

required as well as a continued request for supplementation of labor.  A true and correct copy of that letter is attached hereto as **EXHIBIT 26.**

71.    On November 16, 2017, Roost sent correspondence to ACCO identifying the builder's risk insurance claim concerns and requested cooperation with Adjusters International in pursuing the insurance claims further.

72.    ACCO was immediately adversarial with Adjusters International and has not cooperated in providing documentation and information to Adjusters International.  Throughout the process, ACCO has obstructed the orderly turnover of information needed to substantiate the insurance claims because it was concerned that certain information could be used against it in future litigation by Roost.

73.    ACCO demanded a joint prosecution agreement that would purport to insulate any information exchanged or conversation had that would in any way relate to the insurance claims.

74.    ACCO has demanded that Adjusters International submit a significant claim to the builders risk insurer but has withheld the details of that claim and will not describe why it believes the claim is appropriate.

75.    ACCO will not provide information needed to evaluate or rebut the HSNO or JS Held reports.

76.    In this regard, ACCO has failed and refused to cooperate with the insurance claim process.

77.    On December 20, 2017, Roost again sent correspondence to ACCO requesting a schedule update because one had not been provided since November 3, 2017.  A true and correct

**COMPLAINT AND DEMAND FOR JURY TRIAL - 16**
14178398_6

copy of the correspondence is attached hereto as **EXHIBIT 27.**  The letter further detailed critical pathway markers that had not been met and concerns over supplementation of labor.

78.     By December 28, 2017, ACCO still had not responded to the December 20 letter. Roost requested an updated schedule yet again.

79.     With no updated schedule forthcoming, by January 2, 2018, one of the ACCO Project Superintendents summed up the ACCO project scheduling and completion approach aptly when he stated "wish in one hand and sh*& in the other and see which fills up first."  A true and correct copy of that e-mail communication is attached hereto as **EXHIBIT 28.**

80.     On January 21, 2018, while The Fowler was languishing ACCO was bragging via press release about its ability to complete work for Saint Alphonsus at a record pace and under budget "during a 30-year winter storm."  The press release states:

> Andersen has built medical facilities for St. Alphonsus continuously over the past 15 years throughout the Boise area, but this fall marked a new milestone with three major projects completing within two months. Highlighting the trio is the Boise area's first micro-hospital. The St. Alphonsus Nampa Neighborhood hospital was built for developer Emerus and was completed faster than any of the 20+ micro-hospitals developed by Emerus throughout the country. What's even more impressive is the structure was built during a 30-year winter storm. An air-filled "snow dome" tarp was installed so crews could pour the slab-on-grade and erect tilt panels. The 2-story, 38,782 square foot hospital was completed in nine months, including buildout of an emergency department, imaging, nursing stations and treatment rooms.

81.     While continuing to fail to provide schedule updates or necessary documentation regarding the readiness of the project, substantial completion did not occur at The Fowler until February 21, 2018.

82.     Section 8.8 of the Construction Agreement imposes liquidated damages.  It states:

**COMPLAINT AND DEMAND FOR JURY TRIAL - 17**
14178398_6

**8.8      Liquidated Damages**

Contractor acknowledges that Owner will suffer significant financial damages if Contractor does not achieve the Substantial Completion by the Substantial Completion Deadline. Contractor further acknowledges that the actual damages that would likely be incurred by Owner would be expensive and burdensome to dispute. Therefore, in-lieu-of engaging in an expensive and burdensome dispute about actual damages, Owner and Contractor agree that if Contractor does not achieve Substantial Completion by the Substantial Completion Deadline, Contractor will pay Owner, liquidated damages as follows for each day thereafter until Substantial Completion is achieved. Owner and Contractor agree that the liquidated damages represent a reasonable estimate of the actual damages that would likely be incurred by Owner due to Contractor's failure to achieve Substantial Completion by the Substantial Completion Deadline.

For days 1 through 30 after the Substantial Completion Deadline:       $      0.00 per day;
For days 31 through 60 after the Substantial Completion Deadline:     $2,800.00 per day; and
For each day beyond 60 days after Substantial Completion Deadline:   $7,200.00 per day.

83.    Based on a substantial completion date of February 21, 2018, liquidated damages in the amount of $1,361,200.00 have been incurred.

84.    Roost expended $181,048.16 in additional insurance premiums as a result of the delays caused by ACCO between the original substantial completion deadline and February 21, 2018.

85.    While Roost was requesting assurances regarding the hiring of staff and the impact of the substantial completion deadline, ACCO failed to provide sufficient information. As a result, Roost paid $99,695.00 for a regional property manager, property manager and leasing agent before substantial completion occurred.

86.    Roost has sustained $1,930,085.33 in lost rents as a result of the construction delays.

87.    Roost was forced to extend the production architect that charged an additional amount of $258,616.31.

88.    Roost has been obligated to expend $11,509.10 in travel costs stemming from the need to consistently supervise ACCO's services.

89.    Roost has expended $64,629.00 in additional security services resulting from the delay.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 18**
14178398_6

90.     Roost has been obligated to pay additional interest costs on its construction loan in the amount of $380,565.51.

91.     Roost has experienced increased developer staff time in the amount of $412,137.26 as a result of ACCO's delay.

92.     Roost has experienced increased interest on the final ten-year loan in the amount of $464,178.75.

93.     Roost has experienced a $596,178.49 cost of capital as a result of less proceeds at refinance.

94.     Following substantial completion Roost continued to make efforts to obtain needed cooperation from ACCO regarding the insurance claims described above.  ACCO has continued to obstruct that process, has been uncooperative with Adjusters International, has demanded inappropriate confidentiality for its cooperation and has even accused Adjusters International of taking improper coverage positions when it was merely seeking documentary support of ACCO claims.  This dispute is detailed in the March 15, 2018, letter attached hereto as **EXHIBIT 29.**

95.     ACCO has demanded that Roost make a blanket demand for coverage to the builders risk insurer but has refused to provide sufficient detail regarding that claim.

96.     Following substantial completion, Roost began requesting that ACCO submit a final payment request based on the approved budget in order to properly compensate subcontractors and avoid liens on the project.

97.     On April 9, 2018, ACCO sent e-mail correspondence to Roost agreeing to get subcontractors properly compensated but only if it could extract concessions from Roost

pursuant to the Construction Agreement.  A true and correct copy of that e-mail is attached hereto as **EXHIBIT 30.**  Therein, ACCO stated/demanded:

    i.   ACCO will submit a change request for $3.172 million dollars.

    ii.   ACCO will submit a final pay application which does not include the change request.

    iii.   Roost will release all retained funds under the Construction Agreement.

    iv.   ACCO will guarantee that subcontractors are fully paid.

    v.   ACCO will waive its own lien rights.

    vi.   Roost must agree that change request occurred as a result of weather delay.

    vii.   ACCO and Roost will pursue claims under the insurance policies.

98.    In effect, ACCO was demanding that Roost make representations to the insurer that could not be substantiated because ACCO would not provide necessary information, or ACCO would not cooperate in getting subcontractors paid thereby exposing The Fowler to liens in a manner inconsistent with the Construction Agreement and despite Roost's willingness to pay approved amounts..

99.    On April 10, 2018, Roost sent a detailed response regarding the payment of subcontractors.  A true and correct copy of that e-mail is attached hereto as **EXHIBIT 31.** Therein, Roost stated the following:

> Martin,
>
> I appreciate your e-mail and interest in pursuing a resolution to the various issues that we have pending in order to properly close out the Fowler project.  Please consider the following.
>
> First, Roost concurs that payment of subcontractors is the most pressing priority at this point.  Roost can agree to releasing the retention of

**COMPLAINT AND DEMAND FOR JURY TRIAL - 20**
14178398_6

approximately $690,000.00 on the condition that Andersen obtains full lien releases from all sub-contractors. As you are aware, Section 7.7 of the construction contract mandates that Andersen will deliver the project free of encumbrances or liens. Recent submissions to the bank have shown line items that are over budget. However, those over budget line items do not correspond to approved change orders consistent with Article 10 of the agreement. Bottom line, Roost requires, with the release of the above referenced retention, that all lien releases are provided. Your e-mail also appears to agree with Roost's requirement of a payment application for submittal to the bank that does not include excess amounts not required by the contract or subject to an approved change order. In effect, any excess amounts owed to subcontractors will be paid by Andersen subject to future discussions.

Second, Roost understands that Andersen will be submitting a change request to reflect certain alleged amounts in excess of payments pursuant to the contract or already approved change orders. I think it is well documented that Roost does not agree with the Andersen calculation of such amounts or entitlement to such amounts. In order to properly close out the project and get subcontractors properly paid, Roost suggests that we handle the Andersen change request separately through the dispute resolution process outlined in Article 17 of the construction agreement. As you are no doubt aware, it is Roost's position that the anticipated change order from Andersen is inappropriate and that Roost is entitled to liquidated damages pursuant to the agreement. Further, other actions by Andersen have implicated actual damages. The point is, there are substantial disagreements regarding the final reconciliation of the project that we believe are ripe for mediation consistent with Article 17.

Essentially, we need to button up the contract and the change orders approved to date with a clean pay app to secure lender approval of the retention release. As separate matters, we can then handle the additional amounts we each want to claim against the other through the dispute resolution process, as well as continue to try to work together to maximize the insurance proceeds. Subject to the retention release, we expect Andersen to keep the project free of liens as we proceed through those processes.

I look forward to your response on these issues. I will separately ask our attorney to contact your counsel to discuss a mediation process.

100.   On April 12, 2018, ACCO responded by stating:

You may have misunderstood … to be clear, Andersen will not be fronting payment to subcontractors for funds that are being withheld by LC.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 21**

LC will need to release the contract balance of $690,746.00 along with the full Retention of $1,189,043.00.   The subcontractor's retention payments are due and their lien rights will soon be expiring.  We would not expect the subs to wait on the outcome of a dispute resolution process and let their lien rights expire.  LC will need to pay the full contract balance and release all retention in order to close out the subs and avoid liens.

Andersen has agreed to fund all amounts above our remaining contract and retention balance that will be required to close out the subcontractors, but full retention must be released.

We are interested and open to working with LC and your lender regarding the processing of the final pay request(s) as long as LC agrees to fully cooperate in pursuing Andersen's claim against Traveler's and further agrees that no party is waiving any rights in proceeding as outlined above. We would reserve our right to pursue the claim without the assistance of AI, if it could be done without penalty to LC.

Patrick, we don't want there to be any misunderstanding as to our points and would invite a face to face to finalize the details but we would need to agree to these terms before any mediation.  These terms are Andersen's proposal to avoid the filing of any subcontractor liens.  We would agree to mediate the merit and amount of any claim between Andersen and LC. That, however, would be a separate issue – to be handled after the above terms are agreed upon and subcontractors are paid off.

A true and correct copy of the e-mail correspondence is attached hereto as **EXHIBIT 32.**

101.    On April 14, 2018 ACCO through Steve Jones committed to forwarding a final pay application based upon the above outlined terms.  A draft, unsigned version of the final pay application was forwarded April 16, 2018.  That pay application was not in the form that could be submitted to the lender for payment and did not comply with the requirements under the agreement between the parties.

102.    On April 18, 2018, ACCO demanded a settlement agreement of sorts mandating additional requirements that had not been discussed before.  A true and correct copy of that document is attached hereto as **EXHIBIT 33.**  This draft agreement reinserted the concept of demanding that Roost agree to a delay claim being pressed by ACCO.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 22**
14178398_6

103.    On April 19, 2018 Roost supplied a version of the proposed agreement that was consistent with the April 12, 2018 ACCO communication.

104.    On April 20, 2018 counsel for ACCO contacted counsel for Roost and explained that the only remaining concern related to the acceptance or denial of the ACCO change request and how that would impact ACCO's insurance claim.  Counsel for ACCO committed to providing a revision of the agreement on April 21 or 22 in order the get the subcontractor payment issue underway and reiterated that the insurance claim issue required ACCO to be forthcoming with needed information to support the alleged claim.

105.    Having received no additional information from ACCO, on April 26, 2018, counsel for Roost sent a revised version of the agreement being demanded by ACCO before subcontractors could be properly paid.  A true and correct copy of that e-mail is attached hereto as **EXHIBIT 34.**

106.    By April 27, 2018 Roost was significantly concerned with the statutory deadline for the filing of liens by subcontractors coupled with the absence of a final payment structure. Roost contacted ACCO to obtain a status on the agreement and the payment of subcontractors.

107.    By e-mail dated April 27, 2018, ACCO stated as follows:

> Steve Jones tossed me your latest email.  I'll call you in a few minutes in hopes that we can find enough common ground to clear this current impasse.  I hope so.
>
> Before calling I wanted to share with you the points we are viewing as deal breakers in getting this done.  Lawyers on both sides can argue at length as to whether there is really a legal need for Andersen to have these points.  But, as you are aware there isn't much time for one side to convince the other – if that's even possible.

I'd like to think we can find a way forward that involves some level of agreement to disagree, yet doesn't impact either parties position down the road.

Regards,

Martin

Here are the points:

1.      Roost has to "do the dance" with us to recover the maximum amount of coverage under the Insurance Policy.  They cannot object to the validity or reasonableness of the claim for purposes of insurance;

2.      Roost must cooperate with ACCO in approving/rejecting offers from Travelers to settle the claim (i.e., Roost cannot settle without the consent of ACCO);

3.      Excepting any money due and owing to AI, all Builder's Risk payments must go into escrow until final resolution of all contractual claims;

4.      Roost must agree it will not pursue a contractual claim until the insurance claim has been resolved;

5.      The full balance of the contract must be paid out to the Subcontractors (via joint check), ACCO will then cover the deficiency to subcontractors;

        a.      ACCO will not be responsible for ensuring the project remain lien free until payment has been issued by the Bank.  ACCO will make deficiency payments immediately after the Bank pays the full balance of the contract to the Subcontractors.

For clarity, if an agreement about Subcontractor Payments and pursuing the insurance claim cannot be reached:

1.      ACCO will submit CR-144 with the final pay application, reserving all lien and claim rights;

2.      ACCO will not pay off any Subcontractors;

3.      ACCO will lien the Project.

A true and correct copy of that e-mail is attached hereto as **EXHIBIT 35.**

**COMPLAINT AND DEMAND FOR JURY TRIAL - 24**
14178398_6

108.    In sum, the April 27 ACCO correspondence injected a number of new demands as so-called "deal breakers" that were never previously identified by ACCO with the lien submission deadline pending in hopes that Roost would waive and compromise important contractual rights under the threat of having its multi-million dollar project subject to liens.

109.    Late in the day on April 27, Mike Brown, on behalf of Roost advised ACCO that if it pursued this course of action, Roost would simply pay the subcontractors out of its own pocket and immediately pursue action against ACCO regarding the liens and ACCO's attempt to use the possibility of liens being filed on The Fowler as leverage against Roost.

110.    On April 30, 2018 counsel for Roost sent correspondence to counsel for ACCO demanding the submission of a final pay application and agreement to pay subcontractors and that it would not tolerate further attempts at creating leverage using the threat of subcontractor liens.

111.    ACCO demanded that Roost enter in to a sort of "cooperation agreement" regarding the insurance claims under the threat of allowing the project to become subject to liens. That agreement was entered, allowing for payment of subcontractors and confirming that ACCO had no contractual right to lien the project.

112.    No "final" change request has ever been submitted or approved.

113.    ACCO has continued to make requests of Roost to take certain positions with the insurance carrier but has been evasive in actually providing the necessary information to submit such claims.

114.    On Wednesday, May 23, 2018 counsel for Roost sent correspondence to counsel for ACCO demanding, one last time, the needed insurance claim information.  A true and correct copy of that correspondence is attached hereto as EXHIBIT 36.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 25**
14178398_6

115.    On Monday, May 28, 2018, counsel for ACCO responded stating:

> We will provide you with Andersen's cost information in the format that we would provide it to Travelers.  If AI will provide Andersen's cost information to Travelers without modifying it, then we have no problem with AI doing so presumably along with the Owner's claim, and I would need a copy of the entire submission a few days before it gets sent to Travelers.  However, if AI is going to go through Andersen's submission and modify it in any fashion and/or make coverage determinations adverse to Andersen, then we are not willing to have AI submit Andersen's costs.

A true and correct copy of that e-mail is attached hereto as **EXHIBIT 37.**

116.    Exhibit 37 agrees to provide only information that ACCO is willing to have submitted to the insurance carrier and in the format demanded by ACCO.  Once again, the information is incomplete and the claims process establishes ACCO acting in bad faith and contrary to their obligations under the Construction Agreement.

117.    Counsel for Roost responded to Exhibit 37 on May 29, 2018 stating:

> If the only way Andersen is willing to provide the detailed information that has been repeatedly requested is with the condition that it be used in as-is condition, it appears that we have no other choice but to accept that. Please forward the information and we will review.  If my client disagrees with elements of the costs we will have to circle back to discuss but we will not submit a claim that includes Andersen's costs without its approval.  We will have to insist on receiving that information today.

A true and correct copy of that e-mail is attached hereto as **EXHIBIT 38.**

118.    At the time of filing this Complaint, the information promised in Exhibit 37 has not been provided.

119.    At the time of filing this lawsuit, Roost has been unable to properly pursue potentially covered claims as a result of ACCO's inaction.  The information that has been provided by ACCO is incomplete or provided with conditions that are not workable and defeat the purpose of obtaining an independent adjuster.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT

120.    The foregoing paragraphs are incorporated herein by this reference and restated as if set forth in full.

121.    The Construction Agreement constitutes a valid and enforceable contract.

122.    Roost has fully performed its obligations.

123.    ACCO has failed to substantially perform under the Construction Agreement. Among other things, despite repeatedly assuring Roost that it would substantially perform, ACCO failed to timely complete The Fowler by the stipulated substantial completion date, specifically failed to complete the building shell in time, failed to adequately protect the work, failed to follow the stipulated and detailed project schedules/critical pathways, failed to comply with its reporting obligations regarding delays and deviations, failed to comply with its obligations to provide updated and correct completion schedules, misrepresented the status and anticipated completion date in numerous reports to Roost, failed to properly staff the project and supplement with additional labor when needed, failed to properly enforce subcontractor agreements, failed to properly keep records (documentation of the project, updated schedules, and log work), failed to cooperate and assist with the insurance claim, failed to timely submit pay applications, sought to use the treat of subcontractor liens to obtain concession under the agreement, and improperly threatened to lien the project. ACCO's acts and omissions constitute material breaches of contract.

124.    As a direct and proximate result of ACCO's breaches of contract, Roost has been damaged in an amount to be proven at trial, but not less than $75,000.00.

## SECOND CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

125.    The foregoing paragraphs are incorporated herein by this reference and restated as if set forth in full.

126.    Implied in every express contract is a duty of good faith and fair dealing. The covenant requires, among other things, that the parties perform, in good faith, the obligations imposed by their agreement.

127.    ACCO's acts and omissions, set forth above and that will be revealed in discovery and/or subsequent investigation, demonstrate breaches of the implied covenant of good faith and fair dealing. In particular, ACCO's failure to abide by its reporting obligations and its misrepresentations to Roost prevented Roost from exercising its contractual rights, including the right to terminate ACCO, demand supplementation of additional labor or provide supplemental labor itself.

128.    As a direct and proximate result of ACCO's acts and omissions, Roost has been damaged in an amount to be proven at trial, but not less than $75,000.00.

## THIRD CAUSE OF ACTION - FRAUD

129.    The foregoing paragraphs are incorporated herein by this reference and restated as if set forth in full.

130.    ACCO made material misstatements of fact, which it knew to be false, including the following:

> i.    In the fall of 2016 ACCO recreated a project schedule containing the same or similar substantial completion date after determining that the original schedule was fatally flawed and the superintendent responsible for the original schedule needed to be removed from the project.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 28**
14178398_6

ii.   On February 16, 2016 ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 5, 2017, six days late.

iii.  On March 28, 2016 ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 2, 2017, three days late.

iv.   On April 28, 2016 ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 9, 2017, 10 days late.

v.    On May 9, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 14, 2017, 15 days late.

vi.   On May 16, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 26, 2017, 27 days late.

vii.  On May 23, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 26, 2017, 27 days late.

viii. On May 31, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

ix.   On June 7, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

x.    On June 13, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

xi.   On June 20, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

xii.  On June 27, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 29**

xiii.    On July 20, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 16, 2017, 17 days late.

xiv.    On September 2, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 13, 2017, 14 days late.

xv.    On September 30, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 13, 2017, 14 days late.

xvi.    On November 7, 2016, ACCO sent an e-mail update indicating that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xvii.    On December 1, 2016, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xviii.    On December 7, 2016, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xix.    On December 14, 2016, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xx.    On January 5, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xxi.    On January 11, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xxii.    On January 19, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

xxiii.    On February 2, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

    xxiv.  On February 16, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

    xxv.  On March 2, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

    xxvi.  On March 9, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

    xxvii.  On March 15, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

    xxviii.  On April 6, 2017, ACCO represented in an OAC meeting that its anticipated substantial completion of The Fowler would be June 21, 2017, 22 days late.

    xxix.  The May 12, 2017 ACCO letter to Roost stating that a snowstorm in late December of 2016 and early January of 2017 coupled with a shortage of construction labor was the reasoning behind a seven month delay.

    xxx.  The May 19, 2017 ACCO correspondence again stating that a snowstorm was the basis for the delay, and stating that it developed a plan to reach substantial completion by November 1, 2017.

    xxxi.  The May 30, 2017 correspondence again blaming weather for the delay, and committing to a November 6, 2017 substantial completion deadline.

    xxxii.  The Updated Schedule (Exhibit 12), received on June 7, 2017, showing a multitude of alleged completion deadlines including a November 6, 2017 substantial completion deadline.

    xxxiii.  The master schedule sent in early August 2017, suggesting a substantial completion date of November 8, 2017.

    xxxiv.  The October 20, 2017 emailed correspondence from ACCO, showing a rudimentary schedule identifying a substantial completion of December 21, 2017.

131.    ACCO's representations were made both orally and in writing.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 31**

132.    ACCO made the foregoing misstatements with the intent that it would be relied upon by Roost.

133.    Roost had no actual and/or constructive knowledge of the falsity of ACCO's misrepresentation when it relied upon ACCO's representations and ACCO's representations prevented Roost from discovering the truth regarding the project.

134.    Based on Roost's relationship with ACCO, it had no reason to doubt the representations made and, therefore, justifiably relied on the foregoing material misrepresentations.

135.    As a direct and proximate result of ACCO's fraudulent conduct, Roost has been damaged in an amount to be proven at trial, but not less than $75,000.00.

136.    Accordingly, Roost is entitled to a money judgment for damages in an amount to be proven at trial.

## **FOURTH CAUSE OF ACTION – IDAHO CONSUMER PROTECTION ACT**

137.    Roost incorporates herein all allegations set forth above as though restated in full.

138.    Idaho's Consumer Protection Act ("ICPA") is codified at Idaho Code § 48-601, *et. seq.*

139.    Idaho Code § 48-608 states:

Any person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by this chapter, may treat any agreement incident thereto as voidable or, in the alternative, may bring an action to recover actual damages or one thousand dollars ($1,000), whichever is the greater.

I.C. § 48-608(1).

140.    Idaho Code § 48-603 sets forth the acts declared to be unlawful, as referenced in Idaho Code § 48-608(1). Idaho Code § 48-603 states that it shall be unlawful to engage "in any

act or practice which is otherwise misleading, false, or deceptive to the consumer." I.C. § 48-603; *see also* IDAPA 04.02.01.030, ("It is an unfair and deceptive act or practice for a seller to make any claim or representation concerning goods or services which directly, or by implication, has the capacity, tendency, or effect of deceiving or misleading a consumer acting reasonably under the circumstances.").

141.    ACCO engages in trade and commerce in the state of Idaho by offering services to consumers in the state.

142.    ACCO and/or their agents, shareholders and/or officers engaged in acts and/or practices unlawful under Idaho Code § 48-601, *et. seq*., by, among other things, obtaining Roost's business by representing itself as having sophisticated scheduling and construction management techniques and tools that would keep the project on schedule where local contractors would be unable to do so, repeatedly assuring Roost that it would substantially perform, failing to comply with its reporting obligations regarding delays and deviations, failing to comply with its obligations to provide updated and correct completion schedules, misrepresenting the status and anticipated completion date in numerous reports to Roost, failing to properly keep records (documentation of the project, updated schedules, and log work), causing an inability to make proper and appropriate insurance claims, interfering with Roost's contractual rights through material misrepresentations of fact, and improperly threatening to lien the project. ACCO's acts and omissions constitute misleading, false and deceptive acts under ICPA.

143.    ACCO knew, or in the exercise of due care should have known, that its actions were prohibited by the Idaho Consumer Protection Act.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 33**
14178398_6

144.     As a direct and proximate result, Roost suffered an ascertainable loss of money and/or property, including, but not limited to, damages suffered as a result of delay and additional expenditures that Roost would not have made but for ACCO's acts and/or practices— lost revenues, and fees and costs associated with attempting to remedy the situation.

145.     Roost has been damaged in an amount to be proven at trial, but not less than $75,000.00, and is entitled to judgment in the amount of Roost's damages.

## FIFTH CAUSE OF ACTION –BREACH OF THE IMPLIED WARRANTY OF WORKMANSHIP

146.     Roost incorporates herein all allegations set forth above as though restated in full.

147.     Every construction contract contains an implied covenant that the contractor will perform its obligations under the contract in a good and workmanlike manner, creating an implied warranty.

148.     ACCO impliedly and explicitly warranted that The Fowler would be constructed in a workmanlike manner.

149.     ACCO breached this duty by failing to plan and prepare for anticipated snowfall, failing to place a tarp over The Fowler to prevent snow from accumulating inside the top floor of the building, and melting accumulating snow into the structure, rather than shoveling the snow from the area.

150.     As a result of this breach, ACCO caused damages.

151.     As a direct and proximate result of ACCO's breach, Roost has been damaged in an amount to be determined, but in excess of $75,000.00.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial pursuant to Idaho Rule of Civil Procedure 38.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 34**

## PUNITIVE DAMAGES

Roost reserves its rights to seek permission from the Court to add a claim for punitive damages pursuant to Idaho Code § 6-1604 and/or Idaho Code § 48-608 based upon the existence of oppressive, fraudulent, malicious, and/or outrageous conduct, or repeated and flagrant violations of the Idaho Consumer Protection Act, on the part of ACCO in the performance of its contractual duties to Roost pursuant to the Construction Agreement.

## ATTORNEYS' FEES AND COSTS

It has been necessary for Plaintiff to retain counsel to bring this action.  Plaintiff requests that the Court award them actual costs and fees they incur in this matter pursuant to, among other provisions, Idaho Code §§ 12-120(3), 12-121, 48-608(5) and any other applicable provision of law in the event ACCO contests this litigation in any manner.  In the event ACCO does not contest this litigation, Plaintiff requests attorney's fees and Court costs of $8,500.00, pursuant to Idaho Code §§ 12–120, 12-121 and 48-608(5).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Andersen as follows:

1.       For damages as may be proven at trial or default proceedings;

2.       For recovery of attorney fees and costs incurred in connection with this lawsuit, and in the event that Andersen fails to appear and contest this matter that such amount be in the amount of $8,500;

3.       Pre- and post- judgment interest;

**COMPLAINT AND DEMAND FOR JURY TRIAL - 35**
14178398_6

4.      For such other and further relief as the Court deems just and proper or that is otherwise requested or reserved by Plaintiff in the allegations above.

Dated:  May 30, 2018.

GIVENS PURSLEY LLP


*Bradley J. Dixon*
Bradley J. Dixon
Attorney for Plaintiff