UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

THE ROOST PROJECT, LLC, a
California limited liability company,

    Plaintiff/Counterdefendant,

    vs.

ANDERSEN CONSTRUCTION
COMPANY, an Oregon corporation,

    Defendant/Counterclaimant.

Case No. 1:18-cv-00238-CWD

**MEMORANDUM DECISION
AND ORDER**

## INTRODUCTION

This case involves a dispute regarding the respective rights, obligations, and liabilities of the parties arising out of and relating to construction of The Fowler building in downtown Boise, Idaho. The Roost Project, LLC (Roost) and Andersen Construction Company (ACCO) entered into a contract (the Construction Agreement) to build The Fowler in December 2015. The project was delayed for a host of different reasons resulting in The Fowler being finished eight months after the initial contract completion date. As a result, Roost initiated this action against ACCO raising contract and tort claims. ACCO denies those claims and has filed counterclaims against Roost.

Presently before the Court are the parties cross motions for partial summary judgment, Roost's motion to amend the complaint to add punitive damages, and ACCO's motion to strike. The motions are fully briefed. The Court conducted a hearing on

December 12, 2019. After careful consideration of the record, the parties' briefing and supporting materials, and oral argument, the Court finds there are several genuine issues of material fact in this case which preclude summary judgment. The Court will therefore deny both summary judgment motions. The Court will also deny the motion to add punitive damages. The motion to strike will be granted in part and denied in part.

## FACTS [1]

### 1. The Construction Agreement

On December 11, 2015, Roost and ACCO entered into the Construction Agreement to build The Fowler, a mixed-use building predominately developed as a residential apartment complex. (Dkt. 10-1.) The substantial completion date for the project was in June 2017. (Dkt. 10-2, Ex. B.) The project broke ground on February 5, 2016, and was substantially completed on February 21, 2018, eight months after the contract completion date. The parties disagree over which party breached and which party performed under the Construction Agreement and whether either party is otherwise liable for or entitled to damages outside of the contract.

Roost contends ACCO breached several terms of the Construction Agreement and is not entitled to any relief. Generally, Roost argues ACCO failed to deliver the project on time and failed to provide the project schedule updates, reports, and notices required by the Construction Agreement. Further, Roost argues ACCO mismanaged the project,

---

[1] The parties each submitted a statement of facts with their respective summary judgment motions. (Dkt. 36, 40.) When discussing the facts, the parties' arguments, and the record herein, the Court will cite to the portion of the applicable statement of facts wherein the supporting documents are cited or will cite directly to the record or document itself.

misrepresented the project's status, and concealed information about the project from Roost. ACCO disputes Roost's claims, countering that it performed under the terms of the Construction Agreement, did not misrepresent or conceal information, properly managed the project, and that Roost failed to act in good faith by refusing to approve changes and equitable adjustments to the project schedule.

Several provisions of the Construction Agreement are implicated by the parties' positions in this case. The following are particularly relevant.

## A.    Contractor's General Representations and Warranties

Section 5.9 states, in relevant part:

Contractor makes the following express representations and warranties to Owner, which are continuing during the term of this Agreement:

5.9.2 Contractor has thoroughly and carefully examined the Contract Documents (as a contractor, not a licensed design professional), and has found them to be complete, coordinated and suitable for Contractor's performance of the Work in accordance with this Agreement.

5.9.3 Contractor has thoroughly and carefully examined the Project Schedule and has found it to be complete and to provide suitable time for Contractor's performance of the Work in accordance with this Agreement.

5.9.6 Contractor is familiar with the local and other conditions which may be material to Contractor's performance of its obligations under the Contract Documents (including, but not limited to transportation, seasons and climates, access, the handling and storage of materials and fuel and availability and quality of labor and materials). Contractor has thoroughly and carefully examined the market conditions related to the Work, including the availability and pricing of materials, labor, supplies and all other things necessary for the performance of the Work and found them to be adequate for Contractor to perform the Work as provided in the Contract Documents.

(Dkt. 10-1 at § 5.9.)

## B. Project Schedule Notifications, Delays, and Changes

The Construction Agreement states that ACCO will keep Roost "fully informed of Contractor's performance of the Work so Owner can have timely and meaningful opportunities to review and input" and "Contractor will promptly notify Owner of any actions or decisions required of Owner for Contractor to timely and properly perform the Work, and any deadlines pertaining thereto to prevent delays in the Work." (Dkt. 10-1 at § 5.2.1 and § 5.2.2.) Article 8.1 addresses the project schedule, stating:

> Contractor will commence performance of the Work upon Owner's notice to proceed and will diligently and expeditiously continue its performance until all Work has been fully completed. The dates in the Project Schedule are of the essence and will not be exceeded by Contractor without Owner's prior consent or as permitted in Section 8.3.2. If and when Contractor has reason to believe that any date in the Project Schedule may not be met, Contractor will make appropriate recommendations to Owner to keep the Work on schedule, bring the Work back on schedule and/or mitigate potential impacts of a delayed performance. Contractor represents and warrants to Owner that the Substantial Completion Deadline provides a reasonable time for completing the entire Work, including the time specified for the review of Contractor Submittals by Owner and Governmental Authorities.

Delays and extensions of time to the project schedule are covered by Article 8.3 which requires the Contractor to diligently avoid delays in timely performance and to immediately notify the Owner of any matter wholly or partially preventing or delaying timely performance and provide regular reports concerning the same. (Dkt. 10-1 at § 8.3.1.) Section 8.3.2, in particular, sets for the process for the Contractor to make a claim for an equitable adjustment to the project schedule where "the critical path of the Contractor's performance is wholly or partially prevented or delayed due to" certain listed circumstances. (Dkt. 10-1 at § 8.3.2.)

Changes in the work by the Owner are addressed in Article 10 of the Construction Agreement which sets forth the procedures for change orders and change directives. (Dkt. 10-1 at § 10.2, § 10.3.) Article 17 covers resolution of claims, setting forth the process for the Contractor to make a claim and setting forth the parties' rights and responsibilities in resolving a claim.

2.      **Construction of The Fowler**

Between groundbreaking in February 2016 and July 2016, ACCO's superintendent, Tom Hayes, provided project schedule updates to Roost on February 16, March 28, April 22, and June 27. Hayes provided a master schedule update on July 20, 2016 which reported a new substantial completion date of June 16, 2017, a delay of a few days from the original contract completion date. ACCO attributed the delay to problems with the project's design and the concrete subcontractor's lack of adequate manpower and quality control issues. (Dkt. 40 at 9-12.)

Roost alleges the project schedule, from its inception, was not buildable and the Hayes updates made unrealistic predictions, did not provide the information required by the Construction Agreement, and concealed the true status of the project which was already behind schedule because of ACCO's mismanagement, poor scheduling, and failure to account for the local labor market. (Dkt. 36 at 9-12.) ACCO disputes that it concealed information about the project, arguing the schedules contained information about the project's delays and that ACCO believed the project was still buildable by the June 2017 completion date despite the delays. (Dkt. 40 at 8-13.) Further, ACCO maintains Roost knew of the problems delaying the project, as it had unfettered access to monitor and

physically observe the construction progress and the delays were discussed with Roost in meetings, field reports, and emails. (Dkt. 40 at 6-12.)

In July 2016, Carl Benjamin replaced Hayes as ACCO's superintendent on the project. (Dkt. 40 at ¶ 28.) In early September 2016, Benjamin issued new master schedules. Roost alleges the new master schedules contained none of the information from the prior schedules, making it impossible to monitor the status of the project and, further, that the September 2016 schedules were unreasonable and concealed project information. (Dkt. 36 at 12-14, 25.) Roost further claims that, during the fall of 2016, it requested project information from ACCO but received no official schedule updates as required by the Construction Agreement, and the reports it did receive from ACCO concealed important information about the project's delays. (Dkt. 36 at 12-23, 25.) During this time, the summer/fall of 2016, ACCO argues the project was delayed by subcontractor labor shortage issues and disputes that it concealed information about the project; ACCO maintains that Roost was aware of the issues delaying the project. (Dkt. 40 at 13-17.) Regardless of the delays, ACCO asserts it still believed it could complete the project by the June 2017 substantial completion date. (Dkt. 40 at 16.)

On December 4, 2016, winter weather arrived in Boise. The following day, ACCO submitted a change request asking Roost for a one-day extension due to adverse weather conditions. Roost denied the request on December 6, 2016. The winter weather in late 2016 to early 2017 is the subject of much dispute between the parties with regard to their respective obligations and performance under the Construction Agreement and the impact of the weather on the project in terms of delays and damage to the building.

Roost alleges ACCO's mismanagement of the project from the beginning resulted in the roof not being completed and the building not being enclosed on time, causing the building to be exposed to the winter weather. (Dkt. 36 at 24.) Roost further alleges ACCO failed to take proper action to protect the building from the weather, and that ACCO failed to perform its obligations under the Construction Agreement or initiate any of the contract procedures to request relief for the delay.

ACCO argues the winter storm was unforeseeable and beyond its control and that it satisfied the Construction Agreement's notice requirements. (Dkt. 40 at 17-19.) ACCO further argues Roost was aware the winter weather had caused delays in the construction, noting Roost submitted and pursued a claim to the builder's risk insurance on January 13, 2016, relating to the weather, and the parties had ongoing communications about the delays and project schedule. (Dkt. 40 at 19-23.)

From January 2017 through April 2017, the substantial completion date reported on the project schedules remained June 2017. Roost alleges that, during this time, ACCO failed to provide schedule updates as required by the Construction Agreement and concealed information about labor shortages, its ability to timely complete the work, and the extent of project's delay. (Dkt. 36 at 25-31.) ACCO claims at this time, Roost knew the project was delayed, the issues causing the delay, and that there was insufficient information for ACCO to provide an updated schedule. (Dkt. 40 at 18-23.)

On May 6, 2017, ACCO issued a schedule update reporting a new completion date of January 26, 2018. (Dkt. 36 at 31, ¶ 112.) ACCO attributed the delay to the winter storm and labor shortages. (Dkt. 40 at 23-24.) Roost responded that the new schedule was

unacceptable and argues now that ACCO knew it could not meet the new schedule, that ACCO was continuing to conceal and misrepresent information about the project, and that Roost was considering terminating ACCO from the project. (Dkt. 36 at 31-34.)

In response, ACCO created a more aggressive timeline for completing the project and issued a schedule update in June 2017 with a substantial completion date in early November 2017. (Dkt. 40 at ¶ 53.) This schedule, Roost argues, was "fabricated," because it was based on an accelerated schedule that ACCO knew was impossible to meet given the labor shortage and that ACCO continued to conceal and misrepresent information from Roost. (Dkt. 36 at 34-37.) ACCO maintains it did not conceal or misrepresent information from Roost and that it was "attempting to hit the November 2017 substantial completion date." (Dkt. 40 at 24-26.) Based on the information and assurances provided by ACCO, Roost decided to not terminate ACCO from the project. (Dkt. 36 at 37, ¶ 141.)

In the summer and fall of 2017, the project's substantial completion date remained early November 2017. Roost expressed concerns to ACCO about timely completion of the project and requested information from ACCO but, Roost argues, it received no official schedule updates and only "rudimentary" schedule information. (Dkt. 36 at 37-41.) Roost alleges during this time ACCO continued to misrepresent, conceal, and deprive Roost from important project information. ACCO maintains it did not conceal information, arguing it provided schedule updates and information and that Roost was aware of the problems with the project. (Dkt. 40 at 23-26.)

The Fowler was substantially completed on February 21, 2018. Following completion, the parties engaged in negotiations to close out the project, pay the

subcontractors, and conclude their builder's risk insurance claim. During those negotiations, Roost alleges ACCO made demands concerning Roost's contract claim and leveraged the threat of subcontractor liens on the property to get Roost to agree to its demands. (Dkt. 36 at 41-42.) The parties ultimately agreed to a cooperation agreement to pay the subcontractors and jointly pursue and cooperate with the insurance claims. (Dkt. 36 at ¶ 170.)

On May 30, 2018, Roost filed its initial complaint in this case, which it amended on July 16, 2018, claiming: breach of the Construction Agreement; breach of the implied covenant of good faith and fair dealing; fraud; violation of the Idaho Consumer Protection Act; and breach of the implied warranty of workmanship. (Dkt. 1, 10.)[2] Roost also reserved the right to add a claim for punitive damages. On August 21, 2018, ACCO filed an answer and counterclaims for 1) breach of contract and the covenant of good faith and fair dealing; and 2) unjust enrichment and quantum meruit. (Dkt. 22.)

On September 25, 2019, Roost filed the present motion to amend the complaint to add punitive damages and motion for partial summary judgment, seeking dismissal of ACCO's counterclaims. (Dkt. 34, 35.) On October 2, 2019, ACCO filed its motion for partial summary judgment on Roost's claims of fraud, violation of the Idaho Consumer Protection Act, and breach of the implied warranty. (Dkt. 39.) ACCO also filed a related

---

[2] The Court has jurisdiction over these proceedings based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

motion to strike. (Dkt. 46.) The Court will first take up the motion to strike and next address the summary judgment motions and motion to add punitive damages.

## STANDARD OF LAW

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates "there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). Evidence includes "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits...." *DeVries v. DeLaval, Inc.*, 2006 WL 1582179, at *5 (D. Idaho June 1, 2006), report and recommendation adopted, 2006 WL 2325176 (D. Idaho Aug. 9, 2006).

The moving party initially bears the burden to show no material fact is in dispute and a favorable judgment is due as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets this initial burden, the non-moving party must identify facts showing a genuine issue for trial to defeat the motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). The Court must grant summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## DISCUSSION

### 1.      Defendant's Motion to Strike

ACCO moves, under Federal Rule of Evidence 408, to strike materials and references to settlement and compromise statements from Roost's Statement of Facts and attached Exhibits. (Dkt. 46.)[3] Specifically, the email correspondence and attached documents from April 2018, after The Fowler was substantially completed, between Mike Brown, Patrick Boel, Martin Cloe, and Steve Jones.[4]

Under Rule 408, statements made during settlement negotiations generally cannot be used as evidence to either prove or disprove the validity or amount of a disputed claim or to impeach a statement made during such negotiations. Rule 408 is intended to promote non-judicial settlement of disputes by making evidence of settlement or attempted settlement inadmissible when offered to either prove or disprove the validity or amount of a disputed claim or for impeachment. Fed. R. Evid. 408, advisory committee's note (1972). Evidence of offers of compromise and settlement negotiations are, however, admissible for purposes other than establishing the validity, invalidity, or amount of the disputed claim. Fed. R. Evid. 408(b) ("The court may admit this evidence for another purpose, such as

---

[3] The motion to strike was initially brought under both Rule 408 and Civil Rule of Procedure 12(f). ACCO agrees it is precluded from raising Rule 12(f) on this motion. (Dkt. 59.) The Court will therefore address only Rule 408 in ruling on the motion.

[4] ACCO seeks to exclude: Paragraphs 165-171 in Roost's Statement of Facts (Dkt. 36); Exhibit 44 to the Affidavit of Bradley J. Dixon (Dkt. 36-4); and Exhibits Z, AA, BB, CC, and DD attached to Patrick Boel's Affidavit (Dkt. 36-2). (Dkt. 59 at 3.)

proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.")

Courts have admitted evidence of settlement negotiations for another purpose where that purpose is not the validity or amount of a disputed claim; such as to prove the existence and terms of the settlement agreement itself, *Seymour v. Renaissance Healthcare Group, LLC*, No. 3:14-CV-144-PLR-HBG, 2015 WL 1458049, at \*4 (E.D. Tenn. March 30, 2015) (citing cases), or to prove a party's knowledge of a legal obligation, notice, or concealment to avoid a legal obligation, *In re: General Motors LLC Ignition Switch Litigation*, 14-MD-2543(JMF), 2015 WL 7769524, at \*2-3 (S.D.N.Y. Nov. 30, 2015).

Roost argues the emails and exhibits referenced in ACCO's motion to strike are admissible under Rule 408(b) for another purpose, as evidence supporting Roost's motion to add a claim for punitive damages. (Dkt. 51.) The exhibits, Roost contends, show ACCO made threats and demands related to the payment of subcontractors, the insurance claim, and liquidated damages claim which evidence bad faith and bad acts needed to pursue punitive damages.

The Court finds the exhibits are admissible for the limited purpose of Roost's motion to add a claim for punitive damages. *See* Fed. R. Evid. 408, advisory committee's note (2006) ("Rule 408 in inapplicable if offered to show that a party made fraudulent statements in order to settle a litigation."); *Malmquist v. OMS Nat. Ins. Co.*, No. 09-1309-PK, 2011 WL 3298651, at \*3 (Aug. 1, 2011). ACCO's motion to strike is denied in this regard.

The exhibits are not, however, admissible as evidence of any of the contract-based claims or to prove the validity or amount of those disputed claims. The motion to strike is granted to the extent the evidence is offered in support of either parties' motion for summary judgment on the breach of contract claims. The Court makes no determination at this time on the admissibility of this evidence at trial for any claims or any purpose.

**2.      Plaintiff's Motion for Partial Summary Judgment**

Roost moves for partial summary judgment on ACCO's counterclaims. (Dkt. 35.) ACCO argues genuine issues of material fact preclude summary dismissal of the counterclaims. (Dkt. 44.) For the reasons that follow, the Court will deny Roost's motion.

**A.      Breach of Contract and Covenant of Good Faith and Fair Dealing**

ACCO's breach of contract and the covenant of good faith and fair dealing claims allege Roost failed to pay ACCO for all of the costs it incurred due to delays to the project completion caused by Roost, including: failing to provide complete and adequate design documents; changing the design documents; refusing to adjust the project completion date for delays beyond ACCO's control; and refusing to approve change orders. (Dkt. 22.) ACCO further alleges Roost failed to obtain adequate insurance and unjustifiably charged ACCO liquidated damages. (Dkt. 22.)

Roost argues summary judgment on these counterclaims is appropriate because ACCO breached the contract by failing to timely deliver the project and is not entitled to any adjustments or other relief under the contract. (Dkt. 35.) ACCO counters, arguing genuine issues of material fact exist as to whether: Roost breached the Construction Agreement by refusing change requests; ACCO provided proper notice for equitable

adjustments to the contract schedule; the winter weather and the labor shortage were events

of force majeure; and, Roost breached the contract by failing to obtain adequate insurance

coverage. (Dkt. 44.)

### i.    Change Requests and Equitable Adjustments

Roost argues ACCO failed to comply with the Construction Agreement's provisions

for submitting an equitable adjustment claim or a change request. (Dkt. 35.) ACCO

maintains it satisfied the contractual requirements and that Roost improperly denied its

requests for schedule adjustments. (Dkt. 44.)

Section 8.3.2 of the Construction Agreement sets forth the process for equitable

adjustments to the project schedule, stating:

> 8.3.2    If the critical path of Contractor's performance is wholly or partially prevented or delayed due to (a) any failure of Owner to fulfill its obligations to Contractor under the Contract Documents, (b) any interference with Contractor's performance by the action or inaction of Owner or its employees, agents or separate contractors, (c) the occurrence of a Force Majeure or (d) any other matter in which Contractor believes Owner bears responsibility under the Contract Documents, Contractor may make a Claim for an Equitable Adjustment to the Project Schedule for any impacts on Contractor's performance that Contractor could not reasonably have been expected to avoid, overcome or mitigate through the exercise of due foresight and reasonable due diligence; provided, however, as a condition precedent to making any Claim for an Equitable Adjustment, Contractor will specifically notify Owner of (a) the specific events or occurrences that Contractor claims to be causing the prevention or delay of Contractor's performance, (b) if known to Contractor, the party or parties that Contractor believes to be responsible for the events or occurrences, and (c) if known to Contractor, what actions Owner can take to avoid, overcome or mitigate the effects of the events or occurrences. Contractor is not entitled to any Equitable Adjustment for any impacts on Contractor's performance without prompt delivery of the foregoing notice to Owner (in this instance "prompt delivery" shall mean 24 hours or less). Owner will promptly respond to Contractor's notice. Upon receipt of an impact notice hereunder from Contractor, Owner will promptly use commercially reasonable efforts to cure impacts that are Owner's responsibility, will keep Contractor reasonably informed of Owner's efforts and will coordinate the efforts with Contractor. Contractor acknowledges and agrees that its sole remedy against Owner for any prevention or delay of Contractor's performance from any cause whatsoever is an Equitable Adjustment to the Project Schedule.

Section 10 of the Construction Agreement sets forth the process for change orders

and change directives for Roost to make changes to the project work and the process for

ACCO to agree, disagree, or implement those change orders or directives. Change orders

were written agreements between the parties for changes to the project work. (Dkt. 10-1,

Section 10.2.1.) Change directives were written orders from Roost to ACCO directing changes in the work. (Dkt. 10-1, § 10.3.)

Section 17.1 sets forth the process for ACCO to initiate a claim dispute, stating:

17.1.1 Contractor acknowledges the Owner's ability to investigate, remedy or mitigate Claims will be substantially prejudiced if Contractor does not initiate a Claim as soon as practical but in any event (a) before Contractor does anything to prejudice Owner's ability to investigate, remedy or mitigate the Claim, (b) no later than any applicable time obligation (including those set forth in Section 8.3.2), and (c) in any event no later than twenty-one (21) days after the date that Contractor first recognizes or should have recognized the occurrence or condition giving rise to the Claim, whichever is earlier.

(Dkt. 10-2 at § 17.1.1.) Article 18 states that "[a]ll notices…and other communications required or permitted by this Agreement must be in writing and delivered by hand…, [or] by electronic mail at the addresses set forth [herein]." (Dkt. 10-2 at Article 18.)

ACCO contends Roost improperly denied the majority of its requests for schedule adjustments resulting from the numerous change directives Roost issued during the course of the project; many of which related to changes in the design documents made during construction. (Dkt. 40 at 9-12.) Roost counters, arguing ACCO is not entitled to any adjustments because did not follow the Construction Agreement's claims procedure; in particular, the notice requirements. Further, Roost argues that ACCO warrantied the design documents, which ACCO knew were incomplete at the time of contracting, and accepted the project schedule when it signed the Construction Agreement. And, regardless, Roost asserts, the changes in the design documents were not the cause of the project's delay. (Dkt. 50 at 3.)

The Court finds genuine issues of material fact exist with regard to these claims, such as: what the parties' obligations were under the contract; the nature, number, type, and timing of changes to the design documents and the other change directives issued over the course of the project; the impact of those change directives on the project schedule; whether Roost met the contract requirements for making changes to the project work and handling requests for extensions of time; whether ACCO satisfied the Construction Agreement's processes for disputing change directives or making a claim for equitable adjustment. The materials filed by both parties to the Construction Agreement clearly show there are facts in dispute on these questions, including the conflicting expert witness reports. (Dkt. 36, 40); (Dkt. 36-1, Ex. A, Report of Stephen P. Warhoe, Ph.D.); (Dkt. 39-4, Ex. 1, Report of Jim Stoner, P.E., CMVP.) These disputes must be resolved by the fact finder at trial.

### ii. Force Majeure Clause

ACCO asserts the project was delayed by force majeure events – the 2016-2017 winter weather and labor shortage – that warranted an equitable adjustment to the project's schedule. (Dkt. 44 at 6-17.) Roost argues ACCO failed to provide proper notice of a force majeure event and, regardless, the winter weather and labor shortage were not forces majeure because they were generally foreseeable, not beyond ACCO's reasonable control, and the risks of such events were specifically assigned to ACCO in the Construction Agreement's warranty provisions. (Dkt. 50.) ACCO contends there is no foreseeability requirement in the Construction Agreement's force majeure clause and, regardless, that there are genuine issues of material fact as to whether the events were beyond ACCO's

reasonable control and unforeseeable at the time the Construction Agreement was signed, and whether ACCO provided the requisite notice of the events to be entitled to an equitable adjustment. (Dkt. 44.)

A force majeure excusing event, by its very nature, must be unforeseeable to some extent at the time of contracting. Black's Law Dictionary defines a force majeure clause as "[a] contractual provision allocating the risk if performance becomes impossible or impracticable, esp. as a result of an event or effect that the parties could not have anticipated or controlled." Black's Law Dictionary 673-74 (8th ed. 2004). Even where, as here, a contract's force majeure clause does not expressly use the word "foreseeability," courts consider foreseeability when determining whether the event qualifies as force majeure. *See e.g. Burns Concrete, Inc. v. Teton County*, 384 P.3d 364 (Idaho 2016); *In re Flying Cow Ranch HC, LLC*, Case No. 18-12681-BKC-MAM, 2018 WL 7500475, at *3 (Bankr. S.D. Fla. June 22, 2018).

The Construction Agreement defines Force Majeure as:

> "Force Majeure" means acts, events or occurrences beyond the reasonable control of Contractor or Owner which delay or otherwise prevent Contractor or Owner from timely performing its respective obligations under the Contract Documents (other than an obligation to pay money), including fires; floods; epidemics; lightning; earthquakes; quarantine; blockade; governmental acts, orders or injunctions; war; insurrection or civil strife; sabotage; unusual delays in transportation through no fault of the party claiming Force Majeure; explosion; boycotts, strikes, lockouts, picketing, work slow-downs and other labor disputes provided that the labor disputes do not involve labor employed by Contractor, any Subcontractor or any sub-subcontractor of any tier; material or equipment shortages through no fault of the party claiming Force Majeure (or their Subcontractors or sub-subcontractors of any tier); changes in law; and any other similar acts, events or occurrences, but only to the extent they are beyond the reasonable control of Contractor or Owner despite prudent and diligent efforts to prevent, avoid, delay or mitigate the effect of the acts, events or occurrences. Applicable acts, events or occurrences do not include (a) those that are the result of willful or negligent actions or inactions of either party; (b) those that do not have a real, quantifiable and adverse impact on the performance of the affected party; and (c) the failures or defaults of any Subcontractor or sub-subcontractor of any tier.

When read in its entirety, the Construction Agreement contemplates that force majeure qualifying events are unanticipated or unforeseeable, at least to some extent. *See Burns*

*Concrete*, 384 P.3d at 367 (quoting *Idaho Power Co. v. Cogeneration, Inc.*, 9 P.3d 1204, 1214 (Idaho 2000) (In construing a written instrument, the Court must "consider it as whole and give meaning to all provisions of the writing to the extent possible."). The catch-all sentence of the clause refers to events beyond the reasonable control of the Contractor "despite prudent and diligent efforts to prevent, avoid, delay, or mitigate…." (Dkt. 10-1, Article 1.) The Construction Agreement's notice requirement for claiming an equitable adjustment due to a force majeure event expressly applies to "impacts on Contractor's performance that Contractor could not reasonably have been *expected* to avoid, overcome or mitigate through the exercise of *due foresight* and reasonable due diligence…." (Dkt. 10-1 at § 8.3.2) (emphasis added.)

The Court finds, however, that there are material facts in dispute precluding summary judgment on this issue. Namely, whether the winter weather or labor shortage were events ACCO could have foreseen at the time of contracting or had reasonable control over, such that either or both of those events qualify as force majeure under the Construction Agreement. The parties have pointed to conflicting evidence on those questions. *See e.g.* (Dkt. 35 at 12-19) (citing evidence that the weather and labor shortages were foreseeable and in ACCO's reasonable control); (Dkt. 44 at 12) (pointing to evidence that at the time construction began, Idaho's construction labor market had begun to surge); (Dkt. 44 at 14-15) (citing evidence that the daily snow depth between December 2016 and January 2017 was ten times higher than average); (Dkt. 50 at 8-9.)

Similarly, there are questions of fact and conflicting evidence as to whether the winter weather and labor shortage caused the project delays. Both sides have retained

experts who offer differing opinions regarding the 2016-2017 weather and labor shortage and whether the delays to the project's completion were attributable to either of those events. *See e.g.* (Dkt. 36-1, Ex. A, Warhoe Report); (Dkt. 39-3, Ex. 1, Report of Alicia C. Wasula Ph.D.); (Dkt. 39-4, Ex. 1, Stoner Report.)

Likewise, there are disputes regarding the parties' performance under the Construction Agreement, including whether ACCO provided proper notice of the force majeure event, whether Roost waived any such notice, whether an equitable adjustment was warranted, and whether the risks of the winter weather and labor shortage were expressly assigned under the warranty provisions of the Construction Agreement.

### iii. Builder's Risk Insurance

Roost seeks summary judgment on ACCO's claim that Roost breached the Construction Agreement by failing to obtain adequate insurance coverage. (Dkt. 35 at 19.) Roost maintains it was under no obligation to purchase insurance for the project under the express terms of the contract, pointing out that Section 12.3.1 of the Construction Agreement required ACCO, not Roost, to purchase builder's risk insurance. (Dkt. 50 at 10.) Roost further argues the Construction Agreement did not require the insurance to cover mold.

The Construction Agreement states:

Section 12.3.1 <u>Coverage Required</u>. Contractor agrees to purchase and maintain property insurance for the entire Work on a replacement cost basis with commercially reasonable deductibles. The policy will be on a builder's risk "all-risk" or equivalent policy form insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage,…windstorm or hail,…water damage, weight of rain, snow, ice or sleet….

(Dkt. 10-1, Ex. 1 at § 12.3.1.) Despite this express language, ACCO argues Roost elected to purchase the insurance coverage and, when doing so, procured a policy that provided for less coverage than what was required under the Construction Agreement. (Dkt. 44.)

"In Idaho, 'parties to a written contract may modify its terms by subsequent oral agreement or may contract further with respect to its subject matter.'" *Beyer v. Storey*, No. 1:12-cv-00231-BLW, 2012 WL 5273324, at * 3 (D. Idaho Oct. 24, 2012) (quoting *Scott v. Castle*, 662 P.2d 1163, 1168 (Idaho 1983)). "One party, however, cannot unilaterally alter the contract's terms. Instead, modification requires assent and a meeting of the minds by both parties." *Id.* "Assent and a meeting of the minds may be implied by the parties' actions or course of conduct." *Id.* "The party asserting modification bears the burden of proving the modification by clear and convincing evidence." *Id.* "When a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim." *Id.* (citing *Liberty Lobby*, 477 U.S. at 255).

The Court finds material facts are in dispute as to whether Roost became obligated to purchase the insurance required under Section 12.3.1 of the Construction Agreement by its conduct and election to purchase the builder's risk insurance and whether the insurance purchased was sufficient to meet the terms of the contract. What the parties said, understood, and agreed with regard to the purchase of the insurance policy and whether those facts altered or amended the express language of Section 12.3.1, turns on disputed questions of fact that must be reserved for resolution by a jury.

### B. Unjust Enrichment and Quantum Meruit

ACCO's second counterclaim for unjust enrichment and quantum meruit is an alternative equitable theory of recovery asserted in the event the Court deems the Construction Agreement unenforceable. (Dkt. 22.) On this claim, ACCO alleges Roost is responsible for paying ACCO for the reasonable value of the work ACCO performed on the project which Roost benefited from and was unjustly enriched by at ACCO's expense and detriment. (Dkt. 22.)

Roost's motion for summary judgment appears to cover both counterclaims. (Dkt. 35, 50.) The parties do not, however, address the second counterclaim independent from the first. (Dkt. 35, 44, 50.) Regardless, the Court has considered the motion for summary judgment as to the second counterclaim and will deny the same.

Both unjust enrichment and quantum meruit are based on equitable principles that imply a contract between the parties when there is no express agreement between parties but their conduct evidences an agreement. *Barry v. Pac. W. Const., Inc.*, 103 P.3d 440, 447 (Idaho 2004) (citing *Peavey v. Pellandini*, 551 P.2d 610, 613 (Idaho 1976)). "To establish a claim for unjust enrichment under Idaho law a plaintiff must prove: (1) a benefit is conferred on the defendant by the plaintiff; (2) the defendant appreciates the benefit; and (3) it would be inequitable for the defendant to accept the benefit without payment of the value of the benefit." *Nelson-Ricks Cheese Company, Inc. v. Lakeview Cheese Company, LLC*, 331 F.Supp.3d 1131, 1145 (D. Idaho 2018) (citing *Countrywide Home Loans, Inc. v. Sheets*, 371 P.3d 322, 326 (Idaho 2016) (citing *Teton Peaks Inv. Co. LLC v. Ohme*, 195 P.3d 1207, 1211 (Idaho 2008)). For a court to award quantum meruit damages, there must

be facts supporting the dual inferences of a request by one party and performance by the other. *Barry*, 103 P.3d at 447.

The doctrine of unjust enrichment does not apply where there is an enforceable express contract between the parties covering the same subject matter. *Wilhelm v. Johnston*, 30 P.3d 300, 307 (Idaho. Ct. App. 2001). In that circumstance, the contract remedies afford adequate relief. *Triangle Min. Co., Inc. v. Stauffer Chem. Co.*, 753 F.2d 734, 742 (9th Cir. 1985); *Thomas v. Thomas*, 249 P.3d 829, 836 (Idaho 2011). "However, an express contract cannot provide adequate relief when it is not enforceable." *Thomas*, 249 P.3d at 836. "[O]nly when the express agreement is found to be enforceable is a court precluded from applying the equitable doctrine of unjust enrichment in contravention of the express contract." *Wolford v. Tankersley*, 695 P.2d 1201, 1203 (Idaho 1984).

Although neither party argues the Construction Agreement is unenforceable, neither has conceded that fact nor has it yet been determined that the Construction Agreement is enforceable. Genuine issues of material fact prevent the Court from ruling as a matter of law on the enforceability of the provisions in the Construction Agreement at issue, and whether either party breached the Construction Agreement. Therefore, it is premature to dismiss ACCO's unjust enrichment counterclaim at this time. *See Ada County Hwy. Dist. v. Rhythm Engineering, LLC*, No. 1:15-cv-00584-CWD, 2016 WL 4582045, at *3 (D. Idaho Sept. 1, 2016); *DBSI/TRI V v. Bender*, 948 P.2d 151 at 160 (Idaho 1997) (quoting *Woldford*, 695 P.2d at 1203). The motion for summary judgment, therefore, will be denied on ACCO's second counterclaim.

**3.      Defendant's Motion for Partial Summary Judgment**

ACCO moves to dismiss counts three, four, and five of Roost's amended complaint alleging: fraud (count three), violation of the Idaho Consumer Protection Act (ICPA) claim (count four), and breach of the implied warranty of workmanship (count five). (Dkt. 39.)

**A.      Fraud Claim**

Roost's fraud claim alleges ACCO made material misstatements of fact which ACCO knew to be false and intended for Roost to rely upon, Roost had no actual or constructive knowledge of the falsity of ACCO's misstatements when it relied upon them, the misstatements prevented Roost from discovering the truth about the project's status and exercising its options under the contract, Roost's reliance was justified, and Roost was injured as a result. (Dkt. 10 at ¶¶ 128-135.)

The elements of an action for fraud are: "(1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity [or ignorance of its truth]; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury." *Frontier Development Group, LLC v. Caravella*, 338 P.3d 1193, 1198 (Idaho 2014). "Each of the elements of fraud must be established by clear and convincing evidence." *Id.* "[W]hether fraud has been proven by clear and convincing evidence is for the determination of the trier of fact." *Id.* "Fraud is to be determined from all the facts and circumstances of the case." *Penn Mut. Life Ins. Co. v. Ireton*, 65 P.2d 1032, 1039 (Idaho 1937).

ACCO challenges the first, sixth, and eighth fraud elements, arguing Roost's fraud claim should be dismissed as a matter of law, because: 1) the alleged misstatements regarding the substantial completion date are not statements of fact but are, instead, non-actionable statements of future intent to perform under the contract; 2) Roost cannot claim it was ignorant of the alleged falsity of ACCO's statements regarding substantial completion because Roost had knowledge of the project's delays; and 3) Roost's knowledge precludes it from arguing justifiable reliance. (Dkt. 39.)

### i.     Statements of Fact

The complaint alleges ACCO made thirty-four material misstatements of fact concerning the project status, schedule, and reasons for delay which ACCO knew to be false. (Dkt. 10 at ¶¶ 129(i)-(xxxiv).) ACCO disputes that it made any fraudulent statements or misstatements and, regardless, argues the statements were non-actionable statements of future intent to perform. (Dkt. 39 at 5-7.) Roost counters, arguing ACCO's misstatements are actionable fraudulent statements because they were factual reports concerning the project required by the contract, which ACCO knew were false at the time they were made and, alternatively, the statements were made with the intent to mislead and with no intention of keeping. (Dkt. 43 at 2-24.)

In general, "[a]n action for fraud or misrepresentation will not lie for statements of future events." *Country Cove Dev., Inc. v. May*, 150 P.3d 288, 294 (Idaho 2006) (quoting *Thomas v. Med. Ctr. Physicians, P.A.*, 61 P.3d 557, 564 (Idaho 2002)). "Opinions and predictions cannot form the basis of a fraud claim because they do not speak to matters of fact." *Id.* "[T]he representation forming the basis of a claim for fraud must concern past or

existing material facts." *Magic Lantern Prods, Inc. v. Dolsot*, 892 P.2d 480, 482 (Idaho 1995).

An exception to the general rule exists where "the speaker made the promise without any intent to keep it, but to induce action on the part of the promisee" or "the promise was accompanied by statements of existing fact which show the promisor's ability to perform the promise and those statements were false." *Gillespie v. Mountain Park Estates, LLC*, 132 P.3d 428, 431 (Idaho 2006); *Country Cove*, 150 P.3d at 294 ("An exception to the general rule exists where a false prediction or opinion is given with the intent to mislead."); *see also April Beguesse, Inc. v. Rammell*, 328 P.3d 480, 490 (Idaho 2014). That is to say, a "promise or statement that an act will be undertaken…is actionable, if it is proven that the speaker made the promise without intending to keep it." *Magic Lantern Prods.*, 892 P.2d at 482. To succeed under this exception, a plaintiff must prove the speaker had no intent of performing the future act or knew the facts were false when the promise was made.

ACCO cites two cases from other jurisdictions where the courts concluded intentionally misleading statements falsely indicating an intention to perform under a contract or concealing a breach of contract do not give rise to an tort action for fraud, independent from claims of breach of contract. (Dkt. 39 at 6-7) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19 (2nd Cir. 1996); *IKEA North America Servs., Inc. v. Northeast Graphics, Inc.*, 56 F.Supp.2d 340, 342 (S.D.N.Y. 1999)). Those cases involved intentionally false promises to perform in the future under a contract.

Here, however, the alleged fraudulent statements were not promises to perform in the future but were, instead, allegedly false statements or misrepresentations of The Fowler's then-existing construction status and completion schedule which ACCO knew were false at the time they were made. There is a fundamental difference between a statement about a fact that is demonstrably incorrect at the time it is made, and therefore actionable in fraud - such as the current status of the project, reasons for delay, and scheduling information - as opposed to a statement of future intent or promise to perform. Statements of future performance or intent are not statements of fact actionable in fraud, because their truth can only be judged in hindsight. Statements of fact such as those Roost has alleged here, on the other hand, were either true or untrue at the time they were made.

The Court finds Roost has pointed to evidence in the record raising genuine issues of material fact on the claim of fraud. Roost has identified evidence in the record upon which a reasonable jury could conclude ACCO made misstatements about the project's status, construction schedule, and substantial completion date that ACCO knew were false at the time they were made and, therefore, actionable in fraud. Alternatively, there are genuine issues of material fact as to whether the alleged misstatements were promises of future intent that ACCO made to mislead and with no intention of keeping. (Dkt. 43 at 22-24.)

Roost points to communications by ACCO which, Roost argues, establish that ACCO made statements of fact about the project that it knew were false when the statements were made and that the statements were given with the intent to mislead. (Dkt. 36 at ¶¶ 129-155.) For instance, Roost alleges ACCO's updates and communications of the

project's status were false and the schedules ACCO provided were "fabricated" to report substantial completion dates that ACCO knew it could not meet. (Dkt. 36 at 36-37); (Dkt. 43 at 16-17.) ACCO disputes these arguments, asserting the evidence does not show ACCO made any false or fraudulent statements, the schedules were not fabricated, and there was no intent to deceive or mislead. (Dkt. 40 at ¶¶ 3, 37, 54); (Dkt. 55.)

### ii.   Ignorance of the Falsity of the Statement

ACCO argues Roost had first-hand knowledge of the events causing the project's delays – i.e., design problems, labor shortage, quality control issues, and winter weather - such that it cannot now claim it was ignorant of the allegedly false misstatements. (Dkt. 39.) ACCO points out that Roost participated in OAC[5] meetings, and walk-throughs, and actively monitored The Fowler's progress. Roost counters that its general knowledge of the issues delaying the project is wholly different from the information ACCO was contractually required to provide concerning the critical path of the project. (Dkt. 43 at 2-5.) ACCO maintains that it provided information to Roost as required by the Construction Agreement, it did not conceal any information, and Roost has not shown how the information allegedly falsified or concealed was different from Roost's own general knowledge about the project's status. (Dkt. 55 at 6-15.)

The Court finds conflicting material facts exist on this issue. Whether ACCO's statements concerning the project's status were false and whether Roost knew they were false are both disputed questions. Roost has identified evidence, such as ACCO's internal

---

[5] "OAC" meetings refers to Owner-Architect-Contractor meetings.

communications, upon which a reasonable jury could conclude ACCO did not believe it could meet the schedules it provided to Roost and ACCO concealed that information from Roost. There is also countering evidence that Roost was aware of the problems and delays with the project which gives rise to a genuine issue of fact as to Roost's claim it was ignorant of the falsity of the statements.

### iii. Justifiable Reliance

ACCO argues Roost's knowledge of the project's ongoing construction status and delays precludes Roost from claiming it justifiably relied on the alleged misrepresentations. (Dkt. 39 at 8.) Roost maintains its reliance on ACCO's alleged false statements was justified because ACCO was contractually required to provide truthful and complete schedules, updates, and reports. (Dkt. 43 at 2-5, 18-22.) Further, Roost asserts its own investigation and monitoring of the project does not negate its justifiable reliance on the allegedly false information it received, because ACCO concealed information making it impossible for Roost to have discovered the inaccuracy or falsity of the representations. (Dkt. 43 at 20-22.)

Genuine issues of material fact exist on this element, such as what information ACCO was required to provide under the Construction Agreement, when and what information was provided to Roost, whether ACCO concealed or misrepresented material information from Roost, and what Roost knew concerning the project's status, delays, and scheduling. These disputed facts must be reserved for the factfinder to resolve at trial.

### B. Idaho Consumer Protection Act Claim (ICPA)

The ICPA is remedial legislation intended to deter unfair and deceptive trade practices and is to be construed liberally. *Western Acceptance Corporation, Inc. v. Jones*, 788 P.2d 214, 216 (Idaho 1990). "An act or practice is unfair if it is shown to possess a tendency or capacity to deceive consumers." *Kidwell v. Master Distributors, Inc.*, 615 P.2d 116, 122 (Idaho 1980). It is not necessary to prove actual intent to deceive or actual deception on behalf of the defendant, as long as a tendency or capacity to mislead consumers has been established. *Id.* at 122–23.

Roost's fourth cause of action alleges ACCO violated the ICPA by engaging in misleading, false, and deceptive acts or practices by misrepresenting its business skills in order to obtain Roost's business; making repeated assurances of its substantial performance; failing to comply with its obligations to report and provide updated and correct schedules; and otherwise misrepresenting the status of the project, all of which interfered with Roost's contractual rights and ability to pursue the insurance claim. (Dkt. 10 at ¶ 141.)

ACCO argues this claim should be dismissed as a matter of law, because it is predicated upon ACCO's alleged fraud. (Dkt. 39.) As discussed above, genuine issues of material fact preclude summary judgment on the fraud claim. For the same reasons, this claim also survives. There are material facts in dispute as to whether ACCO engaged in unfair or deceptive trade practices.

### C.       Breach of the Implied Warranty of Workmanship

Roost's fifth cause of action claims ACCO breached the implied warranty of workmanship by "failing to plan and prepare for anticipated snowfall, failing to place a tarp over The Fowler to prevent snow from accumulating inside the top floor of the building, and melting accumulating snow into the structure, rather than shoveling the snow from the area." (Dkt. 10 at ¶ 148.) In its initial brief and during oral argument, ACCO moved for summary judgment on this claim, arguing the express warranty provision in the Construction Agreement, Section 7.7, governs and supplants the common-law implied warranty claim. (Dkt. 39 at 9.) Roost did not respond to that portion of ACCO's motion for partial summary judgment in either its briefing or during the hearing. (Dkt. 43.)

A breach of the implied warranty of workmanship claim arises in contract. *Petrus Family Trust Dated May 1, 1991 v. Kirk*, 415 P.3d 358 369 (Idaho 2018); *see also Employers Mut. Cas. Co. v. Donnelly*, 300 P.3d 31 (Idaho 2013) (Breach of implied warranty of workmanship sounds in contract, rather than tort.). Much like ACCO's second counterclaim, discussed above, it is premature to dismiss Roost's fifth cause of action at this stage as a matter of law. It has not yet been determined whether the Construction Agreement or its terms, including the warranty provisions, are enforceable in this case. ACCO's motion for partial summary judgment will be denied at this time on this claim.

### 4.       Plaintiff's Motion to Amend Complaint and Add Punitive Damages

Claims for punitive damages are substantive and Idaho law is therefore controlling in diversity cases. *See Edmark Auto, Inc. v. Zurich American Insur. Co.*, No. 1:15–cv–00520–EJL–CWD, 2018 WL 734654, at *12 (D. Idaho Feb. 6, 2018).

The standards governing claims for punitive damages are set forth in Idaho Code Section 6-1604 which provides that, after an appropriate pretrial motion and a hearing, the court must allow a party to amend the pleadings "if, after weighing the evidence presented, the court concludes that, the moving party has established at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." Idaho Code § 6-1604(2). It is well established in Idaho that punitive damages are not favored and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits. *Manning v. Twin Falls Clinic & Hosp., Inc.*, 830 P.2d 1185, 1190 (Idaho 1992) (citing *Jones v. Panhandle Distributors, Inc.*, 792 P.2d 315 (Idaho 1990). The decision whether to submit the punitive damages question to a jury rests within the sound discretion of the trial court. *Id.*

At the trial stage, an award of punitive damages is permissible where the party proves, "by clear and convincing evidence, oppressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." Idaho Code § 6-1604(1). At the motion stage, a plaintiff must show a "reasonable likelihood" that defendants "performed a bad act with a bad state of mind." *Hall v. Farmers All. Mut. Ins. Co.*, 179 P.3d 276, 282 (Idaho 2008). "The determination of whether a party should be permitted to assert a claim for punitive damages is not based upon the type of case or claim [but instead]…revolves around whether the plaintiff is able to establish the requisite intersection of two factors: a bad act and a bad state of mind." *Todd v. Sullivan Const. LLC.*, 191 P.3d 196, 201 (Idaho 2008) (citing *Myers v. Workmen's Auto. Ins. Co.*, 95 P.3d 977, 985 (Idaho 2004)).

As to the first factor, punitive damages are an appropriate remedy only if the plaintiff establishes that "the defendant 'acted in a manner that was an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences.'" *Seiniger Law Office, P.A. v. North Pacific Ins. Co.*, 178 P.3d 606, 615 (Idaho 2008) (quoting *Myers v. Workman's Auto Ins. Co.*, 95 P.3d 977, 985 (Idaho 2004)). As to the second factor, the mental state required to support an award of punitive damages is "'an extremely harmful state of mind, whether that be termed malice, oppression, fraud or gross negligence; malice, oppression, wantonness; or simply deliberate or willful.'" *Id.*

Here, Roost argues ACCO engaged in a continuing course of oppressive, fraudulent, malicious, and outrageous conduct amounting to a bad state of mind and bad acts, beginning with the original construction schedule that continued through the project's construction and after its completion. (Dkt. 34, 49.) Roost alleges the original construction schedule in the Construction Agreement was "unbuildable" from the outset, ACCO repeatedly misrepresented the project's status by reporting on-time completion and fabricating schedules, all the while knowing they could not finish the project by the completion date because of the problems and delays, and concealing the true status of the project from Roost by failing to give notice and provide accurate and truthful information as required under the Construction Agreement. (Dkt. 34 at 5-28) (Dkt. 49 at 3-9.)[6]

---

[6] In support of its reply brief on the motion to amend, Roost filed a supplemental report from Roost's expert, Stephen P. Warhoe, which addresses the functionality of the "look-ahead schedules" that ACCO provided to Roost during the months of October, November, and December

Following the Project's completion, Roost argues ACCO threatened to lien the project and intentionally breach the contract in an effort to leverage Roost into settling its claims. (Dkt. 34 at 30) (Dkt. 49 at 10.) Roost alleges ACCO knew its misrepresentations and conduct would harm Roost and prevent Roost from exercising its contractual rights. (Dkt. 34 at 30-32.)

Having carefully reviewed the record, the Court finds Roost has not shown a reasonable likelihood that ACCO performed bad acts with a bad state of mind. *Hall*, 179 P.3d at 282. While punitive damages may be recovered in a contract action, *Cuddy Mtn. Concrete, Inc. v. Citadel Construction, Inc.*, 824 P.2d 151, 158 (Idaho Ct. App. 1992), breach of the underlying contract by itself is not sufficient to warrant an award of punitive damages, *General Auto Parts Co., Inc. v. Genuine Parts Co.*, 979 P.2d 1207, 1211 (Idaho 1999). In a contract action, an award of punitive damages generally is based on conduct which is unreasonable and irrational in the business context, and demonstrates a lack of professional regard for the consequences of the breach of the contractual agreement. *Cuddy Mtn. Concrete, Inc.*, 824 P.2d at 160.

When the moving party's claims are reasonably disputed and there is substantial evidence that supports the non-moving party's claims, a motion to amend to assert punitive damages will not be allowed. *Hardenbrook v. United Parcel Servs., Co.*, No. CV07-509-S-EJL-CWD, 2009 WL 3530735, at *6 (D. Idaho Oct. 26, 2009) (citing *Strong v.*

2016. (Dkt. 64, 65.) During oral argument, ACCO was given leave to file a response to Mr. Warhoe's supplemental report, if needed. Counsel for ACCO later notified the Court and opposing counsel that no response was needed.

*Unumprovident Corp.*, 393 F.Supp.2d 1012, 1026 (D. Idaho 2005) (Plaintiff did not established reasonable likelihood of proving "the requisite 'extremely harmful state of mind' and 'extreme deviation from reasonable standards'" because of conflicting evidence)).

The facts comprising ACCO's bad acts and bad state of mind alleged here, do not rise to an extreme deviation from reasonable standards of conduct in the construction business or the requisite extremely harmful state of mind needed to pursue a claim for punitive damages. Further, Roost has not established a reasonable likelihood of proving that ACCO's actions or state of mind rise to the level required to allow a claim for punitive damages given the conflicting evidence and the many factual disputes in this case.

The Court will, therefore, deny the motion to amend to add punitive damages. However, if the evidence at trial is sufficient for a jury to find, by clear and convincing evidence, that ACCO committed bad acts and with the requisite bad state of mind, Roost may, at that time, seek leave to submit the issue to the jury.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiff's Motion to Amended Complaint & Add Punitive Damages (Dkt. 34) is **DENIED**.

2) Plaintiff's Motion for Partial Summary Judgment (Dkt. 35) is **DENIED**.

3) Defendant's Motion for Partial Summary Judgment (Dkt. 39) is **DENIED**.

4) Defendant's Motion to Strike (Dkt. 46) is **GRANTED IN PART AND DENIED IN PART**.

DATED: February 4, 2020

Honorable Candy W. Dale
United States Magistrate Judge